No. 2016-1807, -2280

# United States Court of Appeals for the Federal Circuit

POLARIS INDUSTRIES INC.

*Appellant,*

v.

ARCTIC CAT, INC.,

*Cross-Appellant.*

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2014-01427 and IPR2014-01428.

**APPELLANT POLARIS INDUSTRIES INC.'S REPLY BRIEF AND RESPONSE TO CROSS-APPEAL**

J. Derek Vandenburgh
Alan G. Carlson
Dennis C. Bremer
CARLSON, CASPERS, VANDENBURGH, LINDQUIST & SCHUMAN P.A.
225 South Sixth Street, Suite 4200
Minneapolis, MN 55402
Phone: 612-436-9600
Fax: 612-436-9605

*Attorneys for Appellant Polaris Industries Inc.*

Dated: March 17, 2017

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..... iv

STATEMENT OF RELATED CASES ..... vii

COUNTER-STATEMENT OF THE CASE FOR THE CROSS-APPEAL ..... 1

I. Hickey's Interaxle Differential is a Critical Aspect of His Disclosed Invention ..... 1

II. In Addition to Interpreting the Key Claim Term "Extending Between," the Board *Sua Sponte* Adopted a Construction of "Drive Shaft" that Was Not Advocated By Either Party ..... 3

SUMMARY OF THE REPLY AND RESPONSE ..... 6

I. Reply in Polaris's Appeal in the 1427 IPR ..... 6

II. Response to Arctic's Cross-Appeal in the 1428 IPR ..... 9

ARGUMENT ..... 10

I. Polaris's Reply in the 1427 IPR ..... 10

A. Arctic Has Not Successfully Rebutted Polaris's Arguments of Board Error with Respect to Dependent Claims 15–19 ..... 10

1. Arctic Misstates the Facts in an Attempt to Dispute the Many Differences Between Claims 15–19 and the Disclosures of Denney and Furuhashi ..... 11

2. Polaris Did Not Waive Its Arguments with Respect to Claims 15 and 16 ..... 14

3. Claim 15 is Not Invalid Under a Proper Claim Construction ..... 15

4. The Board's Invalidation of Claim 16 is Based on an Unsupported Fact Finding ..... 17

5. Claims 17–19 Are Not Invalid ..........19

a. Arctic Does Not Dispute that Denney Teaches Away from Making the Modifications Necessary to Arrive at the Vehicle of Claims 17–19 ..........19

b. Arctic Continues to Employ an Erroneous Look-Only-at-the-Element Approach to Obviousness ..........20

c. The Fact that the Components of Claims 17–19 Could Be Located in a Myriad of Different Places on a Vehicle Supports Non-Obviousness, Not Obviousness ..........24

d. Arctic Effectively Concedes that the Board Did Not Provide an Adequate Basis for Invalidating Claims 18–19 ..........25

B. Claim 1 Would Not Have Been Obvious ..........27

C. Arctic's Arguments with Respect to Claim 34 Are Not Persuasive ..........28

1. Denney Teaches Away ..........28

2. Polaris's Secondary Considerations Should Not Have Been Disregarded by the Board ..........31

3. Polaris Is Entitled to a Presumption of Nexus Between Its Sales and the '405 Patent ..........37

4. Arctic Did Not Rebut Polaris's Secondary Considerations ..........40

5. Polaris's Secondary Considerations Are Particularly Strong and Overcome Any Purported Prima Facie Case of Obviousness ..........41

II. The Board Correctly Found that Arctic Failed to Prove Unpatentability Based on Hickey and Hill in the 1428 IPR..............................................42

A. Properly Construed, "Extending Between" Requires that the Drive Shafts Span the Distance between the Transmission and the Axle Assemblies..........................................................................................42

B. Arctic's Primary Attack on the Construction of "Extending Between" is Premised on a New Argument that Is Contrary to Arctic's Position in the 1427 IPR and Is Wrong .........46

C. Because Hickey Undisputedly Does Not Meet the Properly-Construed "Extending Between" Limitation, This Court Should Affirm the Board's Decision in the 1428 IPR...........................................................................51

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ...........................53

# TABLE OF AUTHORITIES

## Cases

*Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*,
98 F.3d 1563 (Fed. Cir. 1996) ....................39
*Arctic Cat Inc. v. Polaris Industries, Inc.*,
IPR2015-1781, Paper 47 (P.T.A.B. Jan. 30, 2017). ....................37
*Arctic Cat v. Polaris Industries Inc.*,
IPR2017-00433, Paper 2 (P.T.A.B. Dec. 8, 2016) ....................32
*Belden Inc. v. Berk-Tek LLC*,
805 F.3d 1064 (Fed. Cir. 2015) .................... 23, 28
*Black & Decker, Inc. v. Positec USA, Inc.*,
646 F. App'x 1019 (Fed. Cir. 2016).................... 18, 24
*Cheese Sys. v. Tetra Pak Cheese & Powder Sys.*,
725 F.3d 1341 (Fed. Cir. 2013) ....................29
*Clare v. Chrysler Group LLC*,
819 F.3d 1323 (Fed. Cir. 2016) ....................46
*ClassCo, Inc. v. Apple, Inc.*,
838 F.3d 1214 (Fed. Cir. 2016) .................... 36, 39
*Demaco Corp. v. F. Von Langsdorff Licensing, Ltd.*,
851 F.2d 1387 (Fed. Cir. 1988) .................... 38, 40, 41
*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
567 F.3d 1314 (Fed. Cir. 2009) .................... 8, 30
*Garmin Int'l, Inc. v. Cuozzo Speed Techs. LLC*,
IPR2012-00001, 2013 Pat. App. LEXIS 6301 (P.T.A.B. Mar. 5, 2013).............33
*GE Lighting Solutions, LLC v. AgiLight, Inc.*,
750 F.3d 1304 (Fed. Cir. 2014) ....................49
*Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*,
87 F. Supp. 3d 928 (N.D. Cal. 2015).................... 31, 32
*In re Ethicon, Inc.*,
844 F.3d 1344 (Fed. Cir. 2017) ....................42
*In re Gorelik*,
652 F. App'x 954 (Fed. Cir. 2016)....................49

*In re Mettke*,
570 F.3d 1356 (Fed. Cir. 2009) ....................39
*In re Nuvasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016) ....................26
*In re Urbanski*,
809 F.3d 1237 (Fed. Cir. 2016) .................... 30, 31
*Intri-Plex Techs., Inc. v. Saint Gobain Performance Plastics Rencol Ltd.*,
IPR2014-00309, Paper 83 (P.T.A.B. March 23, 2014) ....................41
*J.T. Easton & Co. v. Atlantic Paste & Glue Co.*,
106 F.3d 1563 (Fed. Cir. 1997) ....................35
*Karlin Tech., Inc. v. Surgical Dynamics, Inc.*,
177 F.3d 968 (Fed. Cir. 1999) ....................45
*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)....................11
*Mformation Techs., Inc. v. Research in Motion Ltd.*,
764 F.3d 1392 (Fed. Cir. 2014) ....................45
*Microsoft Corp. v. Proxyconn, Inc.*,
789 F.3d 1292 (Fed. Cir. 2015) .................... 17, 44
*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ....................50
*PPC Broadband, Inc. v. Corning Optical Comm'ns RF, LLC*,
815 F.3d 734 (Fed. Cir. 2016) .................... 33, 34, 36, 37, 41
*Rambus Inc. v. Rea*,
731 F.3d 1248 (Fed. Cir. 2013) ....................38
*Rosemount, Inc. v. Beckman Instruments, Inc.*,
727 F.2d 1540 (Fed. Cir. 1984) ....................40
*Ruiz v. A.B. Chance Co.*,
357 F.3d 1270 (Fed. Cir. 2004) ....................20
*Personal Web Techs., LLC v. Apple, Inc.*,
2017 U.S. App. LEXIS 2544 (Fed. Cir. Feb. 14, 2017) ....................23
*VirnetX Inc. v. Apple Inc.*,
2016 U.S. App. LEXIS 21887 (Fed. Cir. Dec. 9, 2016)....................50
*WBIP, LLC v. Kohler Co.*,
829 F.3d 1317 (Fed. Cir. 2016) ....................27

*Winner Int'l Royalty Corp. v. Wang*,
202 F.3d 1340 (Fed. Cir. 2000) .......................................................... 24, 29

**Other Authorities**

37 C.F.R. § 42.6(a)(3) ......................................................................35
37 C.F.R. § 42.24 ..............................................................................35
Fed. R. Evid. 702(b) ..........................................................................31

## STATEMENT OF RELATED CASES

No appeal in or from the present *inter partes* review has previously been before this Court or any other appellate court.

There is no case pending in this Court or any other court that will directly affect the Court's decision here. The following cases may be directly affected by this Court's decision here:

Arctic Cat Inc., et al. v. Polaris Industries Inc., et al., Civ. No. 13-3579 (D. Minn.), which is presently consolidated with Polaris Industries Inc., et al. v. Arctic Cat Inc., et al., Civ. No. 14-3386 (D. Minn.) and Polaris Industries Inc., et al. v. Arctic Cat Inc., et al., Civ. No. 14-3412 (D. Minn.). The consolidated cases have been stayed by the District Court.

## COUNTER-STATEMENT OF THE CASE FOR THE CROSS-APPEAL

By agreement of the parties, this Court consolidated Polaris's appeal in IPR2014-01427 ("the 1427 IPR") with Arctic's appeal in IPR2014-01428 ("the 1428 IPR"). Polaris's appeal was designated the lead appeal and Arctic's appeal was designated as a cross-appeal.

Arctic's Statement of the Case for its cross-appeal mis-describes the primary Hickey reference and also fails to discuss the Board's *sua sponte* adoption of a claim construction that neither party advocated and that is inconsistent with the position Arctic has taken in this case.

### I. Hickey's Interaxle Differential is a Critical Aspect of His Disclosed Invention

The lead reference in the 1428 IPR is U.S. Patent No. 3,709,314 to Hickey. The primary improvement of the Hickey patent is a "novel drive train that takes power from the transmission and divides it between a front differential and a rear limited slip differential by means of an interaxle differential." (Appx6098 at 1:22–25.) Below is an annotated Figure 1 of the Hickey patent:




(Appx6095.) This figure shows an engine 12 connected to a transmission 14, connected to an interaxle differential 20 where the torque is transferred to front and rear drive shafts 22 and 24. Front and rear drive shafts 22 and 24 extend between interaxle differential 20 and front and rear differentials 30 and 36, respectively. The interaxle differential selectively transfers torque from the transmission to the front and rear differentials via the drive shafts. (Appx6098 at 1:60–67, 2:3–20; Appx6099–6100 at 4:59–5:10.)

Attempting to downplay the importance of Hickey's interaxle differential, Arctic claims that Hickey describes the incorporation of an interaxle differential as "conventional," "well known" and "not important." (Red Br. 30–31.) That is false. Hickey describes front differential 30 as "well known" and "not important," and describes U-joint 26 as "conventional." (Appx6098 at 2:6–20.) But Hickey

says no such thing about the interaxle differential. Quite the opposite, the interaxle differential is described as the inventive feature throughout Hickey's patent. (See Appx 6094 at Abstract; Appx 6098 at 1:20–28 (Background of the Invention); Appx6098–6100 at 2:3–61 and 4:59–5:10 (Description of the Invention); Appx6100 at 6:7–18 (Claims).)

## II. In Addition to Interpreting the Key Claim Term "Extending Between," the Board *Sua Sponte* Adopted a Construction of "Drive Shaft" that Was Not Advocated by Either Party

Claim 1 of the '405 patent recites, *inter alia*:

- "a front drive shaft extending between the transmission and the front axle assembly for coupling the transmission to the front wheels"; and
- "a rear drive shaft extending between the transmission and the rear axle assembly for coupling the transmission to the rear wheels".

(Appx6046 at 11:20-25.)

In response to institution of the 1428 IPR, Polaris contended that the Board had improperly interpreted the claim term "extending between." Polaris explained that the term "extending between," correctly construed, means that the front and rear drive shafts must span the distance between the transmission and the front and rear axle assemblies, respectively. (Appx5198–5202.) Polaris also noted that it did not believe that the term "drive shaft" required a specific construction. (Appx5202.) To the extent the Board would find it necessary to construe "drive shaft," Polaris explained that the term "drive shaft" refers not just to the rigid shaft

itself, but also may include the associated connectors and U-joints that those skilled in the art generally understand as being part of a "drive shaft." (Appx5202–5204.) Polaris relied on intrinsic and extrinsic evidence for both proposed constructions. (Appx5198–5204.)

Arctic disputed Polaris's proposed construction of "extending between." (Appx5517–5522.) Arctic was completely silent, however, on the term "drive shaft" —it did not dispute Polaris's proposed alternative construction.

Arctic's silence on the term "drive shaft" is not surprising considering that opposing Polaris's construction of "drive shaft" would have required Arctic to contradict the position that both it and its expert took in the related 1427 IPR. Here is the color-coded figure relied on by Arctic in the 1427 IPR to show where the claimed "front drive shaft" could be found in Furuhashi:



(Appx989.) As can be seen, the blue-colored structure identified as the claimed drive shaft is a complex multi-part drive shaft including two rigid shafts and multiple connectors and U-joints. Thus, Arctic's petition in the 1427 IPR depended on a construction of "drive shaft" that permitted inclusion of associated couplers and U-joints.[1]

In its Final Written Decision in the 1428 IPR, the Board agreed with Polaris that "extending between" requires that the drive shafts span the distance between the transmission and the axle assemblies. (Appx49–54.) Thus, the Board rejected Arctic's Petition because Hickey undisputedly did not have a drive shaft "extending between" the transmission and each of the axle assemblies.

While not necessary to its decision, the Board also construed "drive shaft," and adopted a claim construction that neither party advocated. Specifically, the Board concluded that the term was limited to the shaft itself and could not also include associated connectors and U-joints. (Appx47–49.) The Board characterized this construction as "broader" than Polaris's undisputed construction, even though it limited the components that could be considered to make up a "drive shaft." (Appx48.)

---

[1] Polaris did not dispute that the structure identified by Arctic in Furuhashi was a drive shaft that extended between the transmission and the axle assemblies.

# SUMMARY OF THE REPLY AND RESPONSE

## I. Reply in Polaris's Appeal in the 1427 IPR

The '405 patent claims recite a novel vehicle packaging solution—a groundbreaking configuration that was not in the prior art. This is undisputed. The result was a brand-new class of vehicle that was safe, quick, low to the ground, maneuverable and instantly commercially successful.

Arctic's attempt to defend the Board's rulings on dependent claims 15–19 is unpersuasive. As to claim 15, the Board used a wrong claim construction. The claim language is clear, and Arctic's red brief reinforces that Polaris's construction is correct. A protective panel positioned so that it is between only one seat (of a pair of laterally spaced apart seats) and the engine is not a protective panel positioned between both seats (or the pair) and the engine as claimed. Arctic's argument that it would be obvious to modify the Denney plate 45 or Furuhashi plate 143 by extending them to be positioned between both seats and the engine is a new argument, unsupported by evidence in the record, and should not be adopted for the first time on appeal.

As to claim 16, Arctic does not dispute that the Board lacked factual support for its finding that it would be obvious to extend a drive shaft "underneath the ATV of Denney." Instead, Arctic posits a new argument on appeal—namely, that it would have been obvious to modify Denney to extend a drive shaft underneath a

protective panel as recited but not also below Denney's ATV. But that new argument is unsupported by the record evidence and should be rejected.

As to claims 17–19, Arctic does not dispute that Denney teaches away from making the modifications necessary to achieve these elements: namely, raising the seats. Arctic also does not dispute that a significant number of changes must be made to Denney to arrive at the claimed invention, many of which are not even shown in the secondary reference Furuhashi. Instead, Arctic, like the Board, supports making these changes by looking only to each element in isolation. But the law requires that each claimed invention ***as a whole*** be analyzed.

Further with respect to claims 18–19, there can be no real dispute that the Board did not provide a reasoned basis for its decision. The Board's decision on claim 18 constitutes a single conclusory sentence that did not identify or address any evidence supporting the conclusion. The Board's decision on claim 19 is similarly cursory and erroneous.

Arctic's response with respect to independent claims 1 and 34 is also unpersuasive. As to claim 1, Arctic has pointed to no evidence that a POSITA seeking the benefits of four wheel drive and side-by-side seating would start with Denney's dune-buggy type rear-wheel drive vehicle as a primary reference. To the contrary, a POSITA would look to a four-wheel drive vehicle. As to claim 34 (and dependent claim 25), Arctic ignores this Court's explicit teaching away law: "A

reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, ***or would be led in a direction divergent from the path that was taken by the [patentee]***." Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 567 F.3d 1314, 1327 (Fed. Cir. 2009) (emphasis added, internal citation omitted). Notably, and perhaps because it ignored this law, Arctic does not dispute that a POSITA, upon reading Denney, would be led in a direction divergent from the path that was taken by Polaris in these claims.

The Board also improperly rejected out-of-hand Polaris's evidence of commercial success pertinent to claim 34 and claims depending therefrom. Even now, Arctic does not dispute that Polaris's vehicles are covered by these claims of the '405 patent. Nor does Arctic dispute that Polaris's expert's personal inspection and review of products and literature (including parts catalogs and parts drawings) is adequate to ascertain whether the products are covered by the claims. Hence, Polaris was entitled to a presumption of both commercial success and nexus, and the Board erred in failing to give Polaris this presumption.

## II. <u>Response to Arctic's Cross-Appeal in the 1428 IPR</u>

The Board correctly found that Arctic failed to prove unpatentability in the 1428 IPR. The term "extending between" in claim 1 of the '405 patent requires that the drive shafts span the distance between the transmission and the axle assemblies. This construction is the ordinary meaning of "extending between" and is consistent with the many other instances where the term is used in the specification. Under this construction, it is undisputed that the drive shafts of Hickey do not extend between the transmission and axle assemblies as required by claim 1 of the '405 patent. Instead, Hickey's drive shafts extend between the interaxle differential and the axle assemblies. Arctic never presented any evidence or argument that it would have been obvious to modify Hickey to meet the "extending between" limitation.

Arctic's primary argument against the Board's construction—that it excludes the preferred embodiment of the '405 patent—is wrong. U-joints and connectors are required to couple the drive shaft to the axle assembly, and with that coupling mechanism the drive shaft would still be seen as extending between the transmission and the axle assembly, unlike in Hickey. Moreover, Polaris presented undisputed evidence that persons of skill in the art would interpret "drive shaft" as permitting inclusion of associated connectors and U-joints that connect and provide flexibility to the drive shaft. Arctic not only failed to rebut this evidence

or dispute Polaris's construction of "drive shaft," it expressly relied on that construction in reading the '405 patent claims on the prior art in the 1427 IPR. Once it is correctly understood that the claim term "drive shaft" can include associated couplers and U-joints, Arctic's argument that the Board's construction of "extending between" excludes the preferred embodiment melts away.

## ARGUMENT

## I. Polaris's Reply in the 1427 IPR

### A. Arctic Has Not Successfully Rebutted Polaris's Arguments of Board Error with Respect to Dependent Claims 15–19

Polaris's novel vehicle, packaging a multitude of components in a new way, would not have been obvious to a POSITA at the time of the invention. There are probably millions of ways to arrange and place all of the different elements of a vehicle, and Polaris found a way that created a very successful, new category of vehicle. Polaris's '405 patent is very precise and still leaves the door open for myriad different, non-patented designs.

Arctic supports the Board's obviousness conclusion by using hindsight analysis and contradicting the teaching of the prior art. Further, Arctic relies on improper claim construction, resorts to trying to argue waiver, introduces erroneous facts, and raises new arguments.

There is no evidence that Polaris's packaging of parts, especially as recited in the always-narrower claims 15–19, was a predictable packaging of prior art

elements. No references show all of the elements, and even the combined references fail to teach all of the elements unless the combination is modified yet again, and again, and again. There is no evidence that Polaris's invention is merely an "advance[] that would occur in the ordinary course without real innovation." KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 419 (2007).

### 1. Arctic Misstates the Facts in an Attempt to Dispute the Many Differences Between Claims 15–19 and the Disclosures of Denney and Furuhashi

In its opening brief, Polaris pointed out the many differences between the specific vehicle package required by dependent claims 15–19 and the disclosures of Denney and Furuhashi. (Blue Br. 27–28.) Modifying Denney to get to the vehicle of claim 19 requires **eight** different modifications, **five** of which are not shown in either Denney or Furuhashi. (Id. 32–34.)

To reduce the large number of needed modifications, Arctic misstates the facts. With respect to claims 15 and 16, Arctic points to a small, slotted plate 123 disposed within the seat of Furuhashi as being the claimed "protective panel":




(Red Br. 23.) Using an ellipsis to mislead the Court, Arctic claims that "Furuhashi teaches a 'fixed plate 123 . . . provided to cover a clearance 122' between the driver and the engine." (Id.) The ellipsis in the above quote omits Furuhashi's express statement that the plate 123 is located "*under* a seatback 80," not between the seating surfaces and the engine, as specified in claim 15. (Appx1246 at 12:31 (emphasis added).) As Polaris explained to the Board, the small, slotted plate 123 of Furuhashi is not even a protective panel, much less one positioned between a pair of laterally spaced-apart seating surfaces and the engine (as required by claim 15) with a drive shaft extending under it (as required by claim 16). (Appx330–332; Appx3655–3664 ¶¶174–182; Appx1223–1224 and 1240 at Figs. 19, 20, 40.) The Board agreed with Polaris, calling Furuhashi's fixed plate 123 a "purported protective panel" and refusing to find that Furuhashi disclosed the recited structure. (Appx30.) Certainly, the Board did not agree with or adopt Arctic's contention.

Similarly, Arctic states that Furuhashi teaches a fuel tank under one seat, a battery under the other seat, and a front driveshaft positioned between them. (Red Br. 50.) But Furuhashi's battery is undisputedly not under its single seat. (Appx335; Appx3668–3673 ¶¶ 187–190.) In fact, ***none*** of the combined references in the record disclose an ATV with a battery placed under a seating surface like recited in claim 18. Likewise, Furuhashi's front driveshaft is not positioned between the fuel tank and the battery as recited in claim 19. As Polaris explained to the Board, none of the references in the record disclose this element. (Appx336; Appx3677 ¶197.) The Board did not disagree with Polaris, instead concluding that "the modification[s] concern[] placement of certain objects relative to each other, which . . . would have been within the abilities of one of ordinary skill." (Appx31–32.) The Board's recognition that modifications would have to be made shows that the Board recognized that Furuhashi does not disclose the arrangement of components specified in claims 18–19. Certainly, the Board did not agree with or adopt Arctic's contention to the contrary.

Arctic's "facts" should not be accepted at face value. At a minimum, they are not fact findings that the Board made and thus cannot be treated as facts on appeal.

### 2. Polaris Did Not Waive Its Arguments with Respect to Claims 15 and 16

Seeking to dissuade the Court from reaching the merits of Polaris's arguments on appeal, Arctic argues that Polaris waived its arguments with respect to claims 15 and 16. This is not true.

With respect to claim 15, Arctic contends that Polaris never before asserted that claim 15 requires a protective panel positioned between <u>both</u> seats and the engine. (Red Br. 43–44 n.20.) But here is what Polaris explicitly told the Board: "A person of ordinary skill would not understand the mounting plate 45 disclosed by Denney to be a 'protective panel positioned between' <u>both seats</u> and the engine." (Appx330 (emphasis in original).) By emphasizing "both seats," Polaris made clear to Arctic and the Board that the claim element required a protective panel positioned between "both seats" (i.e., the pair of laterally spaced apart seating surfaces) and the engine, not simply between one of the seats and the engine. There is no waiver, as the issue was expressly raised below.

Arctic also wrongly contends that Polaris waived any right to challenge the Board's conclusion that it would have been known to include a front driveshaft of Furuhashi underneath Denney's alleged protective panel (i.e., under Denney's ATV). (Red Br. 48.) Polaris's undisputed evidence shows that Denney's panel extends to the bottom of the frame and that one skilled in the art would not locate a front drive shaft under Denney's vehicle frame because doing so would "expose

the driveshaft to damage and decrease the vehicle's clearance." (Appx1197 at Fig. 1; Appx1199 at Fig. 3; Appx3636 ¶ 140; see also Appx1245 at 10:34–42 (Arctic's Furuhashi reference explains that its front drive shaft is positioned higher than the "lower most level" of the frame so that it "will not be susceptible to hitting ground").) Indeed, if there was waiver by anyone, it was Arctic. Prior to the Board's Final Written Decision, Arctic never contended that a POSITA would be motivated to include a front driveshaft "underneath the Denney ATV," as found by the Board. The Board made its fact finding on its own with no supporting evidence or argument from Arctic.

#### 3. Claim 15 Is Not Invalid Under a Proper Claim Construction

Neither Denney nor Furuhashi disclose a protective panel between a pair of laterally spaced apart seating surfaces and the engine, as required by claim 15. Denney shows a plate 45 disposed between one seat and the engine. (Appx1197 at Fig. 1.) Furuhashi discloses a small, slotted plate 123 under a seatback and in front of the engine. (Appx1223 at Fig. 19.) The Board made no fact finding regarding Furuhashi's slotted plate, instead ruling only that the Denney plate 45 met the limitation of claim 15. (Appx30.) Denney's single panel 45 is not, however, a protective panel positioned between both seats and the engine as claimed. A protective panel positioned between only one seat (of a pair of laterally spaced

apart seats) and the engine is not the same as a protective panel positioned between the "pair of laterally spaced apart" seats and the engine. (See Blue Br. 28–30.)

Arctic's contention that nothing in claim 15 relates to the "lateral" position of the panel vis-à-vis the seats is wrong. (Red Br. 45.) The claim language itself calls out the lateral positioning. The claim requires a "pair" of "laterally spaced apart" seating surfaces, with the panel positioned between "the pair of laterally spaced apart seating surfaces and the engine." (Appx1194.) A panel positioned between one, and only one, of such pair of seats and the engine is not the same thing as a panel positioned between the pair of laterally spaced apart seats and the engine. Arctic's belated attempt to interpret the language to encompass such a panel is improper and ignores the actual claim language.

Under the proper construction advocated by Polaris, Arctic's only argument against reversal is its view that "[i]t would be obvious for a skilled artisan to extend the panels depicted in Denney and Furuhashi so as to cover more of the space between the two seats" (Red Br. 46.) But Arctic never made that argument before the Board nor presented any evidence to support it. As seen by reviewing Arctic's citations, Arctic relied solely on its view that a panel positioned between one seat and the engine constituted a panel positioned between a pair of laterally spaced part seats and the engine. (Appx1026–1027 ¶¶119–121.) Neither Arctic nor its expert previously advocated extending Denney's plate 45 or Furuhashi's

under-seatback slotted plate 123 to be between the pair of seats and the engine. Arctic should not be permitted to raise this new argument now.

Because the Board's analysis of claim 15 is based on an erroneous claim construction and there is no support for a finding of obviousness under a proper construction, the Board's finding of obviousness of claim 15 and the claims depending therefrom is improper and should be reversed. Microsoft Corp. v. Proxyconn, Inc., 789 F.3d 1292, 1299 (Fed. Cir. 2015).

#### 4. The Board's Invalidation of Claim 16 Is Based on an Unsupported Fact Finding

Arctic's brief does not challenge Polaris's main point: There is no factual basis to support the Board's conclusion that "it would have been known to include a front driveshaft of Furuhashi ***underneath the ATV of Denney*** to incur the known benefits of four wheel drive." (Appx30–31 (emphasis added).) Arctic does not dispute that Denney's mounting plate 45 (which the Board found to be a protective panel) extends all the way to the bottom of the vehicle frame. Arctic Cat also does not dispute that running a front driveshaft under Denney's vehicle frame "would not be feasible" because it "would expose the driveshaft to damage and decrease the vehicle's clearance." (Appx3636 ¶ 140; see also Appx1245 at 10:34–42.)

Instead, Arctic first wrongly contends that Furuhashi discloses a drive shaft extending under a protective panel positioned between the laterally spaced apart seating surfaces in the recited arrangement. (Red Br. 47.) The Board never agreed

with this contention, and for good reason. Furuhashi does not disclose this arrangement. (E.g., Appx330–332; Appx3661–3664 ¶¶ 180–182; Appx1207 at Fig. 2; Appx1223 at Fig. 19; Appx1240 at Fig. 40.)

Secondly, Arctic tries to rely on its generic contention before the Board that it would be obvious to extend a drive shaft under a protective panel based on its expert's analysis of Furuhashi. (Red Br. 49.) But this is not the fact finding the Board made and relied on. Instead, the Board made its own fact finding that it would have been obvious to run a drive shaft ***under the frame of Denney's vehicle.*** Arctic did not advocate for this fact finding and there is no record support for it. Indeed, Furuhashi expressly teaches that one should **not** run a drive shaft below the vehicle's frame. (Appx1245 at 10:34–42.)

The Board's conclusion that claim 16 would have been obvious is based on a fact finding that is not supported by any evidence in the record, much less the required substantial evidence. This provides further reason to reverse the Board's decision as to claim 16 and claims 17–19 dependent thereon. Black & Decker, Inc. v. Positec USA, Inc., 646 F. App'x 1019, 1027 (Fed. Cir. 2016) (reversing the Board's finding of obviousness because it was "not supported by substantial evidence").

### 5. Claims 17–19 Are Not Invalid

The Board's invalidation of dependent claims 17–19, in particular, illustrates the improper hindsight underlying the Board's decision. The lead Denney reference teaches away from making modifications to arrive at the invention as claimed. Further, Arctic's relied-upon references fail to disclose all of these packaging solutions. Arctic's and the Board's proposed combinations and modifications demonstrate a hindsight analysis, utilizing a myopic focus on each element by itself instead of each claim as a whole in view of the actual prior art references and their teachings.

#### a. Arctic Does Not Dispute that Denney Teaches Away from Making the Modifications Necessary to Arrive at the Vehicle of Claims 17–19

Polaris's opening brief explains that Denney teaches away from claims 17–19 and that the Board erred by not properly considering such evidence. (Blue Br. 39–45.) Specifically, Denney expressly teaches lowering seats to the bottom of the vehicle frame in order to achieve the benefits of a low center of gravity over any advantages that might be obtained by having higher seats. (Id.) Modifying Denney to accommodate a fuel tank under one seat (claim 17), a battery under the other seat (claim 18) and a drive shaft extending between the fuel tank and the battery (claim 19), would necessarily require raising the seats, contrary to the teaching of Denney. (Id.) The Board improperly created a new "subjective

preferences" standard that is contrary to case law and, if accepted, would improperly lower the standard for obviousness. (Id.)

Strikingly, Arctic does not challenge Denney's teaching away from these claims on appeal.[2] The Board's failure to consider Denney's teaching away from the specific packaging configuration of claims 17–19 is clear legal error that Arctic implicitly concedes. This alone merits reversal.

**b. Arctic Continues to Employ an Erroneous Look-Only-at-the-Element Approach to Obviousness**

As Polaris pointed out in its opening brief, the patentability of each claim must be considered "as a whole" and it is error to evaluate obviousness on an element-by-element basis. (Blue Br. 32–36.) Using the invention as a roadmap to find its prior art components, as the Board did, Arctic employs improper "hindsight reasoning" and "discount[s] the value of combining various existing features or principles in a new way to achieve a new result—often the very definition of invention." Ruiz v. A.B. Chance Co., 357 F.3d 1270, 1275 (Fed. Cir. 2004).

Arctic's appeal brief uses the same hindsight analysis. It focuses solely on the elements recited in the dependent claims, as opposed to the entire invention recited in such claims. (See, e.g., Red. Br. 33 ("[T]hese collateral limitations were

[2] Arctic challenged a different teaching-away argument in the context of independent claim 34 and its dependents. (See Red Br. 33–34, 58–61.) This challenge is discussed below.

obvious. They involved no more than the repositioning of elements in obvious, finite ways."); id. at 50 ("Claims 17–19 claim no more than repositioning of known components (batteries, fuel tanks) into previously-known locations where they would provide previously-appreciated benefits . . . .").) It is this myopic focus on the individual limitations, rather than the invention as a whole, that leads to the improper discounting of Denney's express teaching away from raising the seats to accommodate the modifications needed to be made to arrive at each of claims 17–19 when considered as a whole.

In order to conclude that the invention as recited in each of claims 17–19 as a whole is obvious, it must have been obvious to a POSITA at the time of the invention to modify Denney in at least 8 different ways as explained in Polaris's opening brief. (Blue Br. 26–28.) And many of those modifications—such as raising the seats to put a fuel tank under one, a battery under the other, and a drive shaft between the fuel tank and battery—are inconsistent with Denney's stated goal of reducing center of gravity of the vehicle by locating the seats at the bottom of the frame. (Blue Br. at 39–45.) Arctic has effectively conceded as much by not disputing it. (See Section I(A)(5)(a), supra.) The modifications needed to transform Denney into the invention of claims 17–19 are interrelated, and even inconsistent, with each other and with other design considerations expressed in

Denney. (Appx3628–3640 ¶¶ 119–152; Appx3654–3678 ¶¶ 173–199.) The invention, as a whole, recited in these claims is not obvious.

Further, with respect to claim 18, the Board's analysis was wrong. The Board stated: "Patent Owner's assertion and our analysis are similar to those as set forth above for dependent claim 17, with 'battery' replacing 'fuel tank,' and, thus, need not be repeated here." (Appx32.) That sentence is neither accurate nor sufficient to invalidate claim 18. No reference discloses a battery under the seat. (Appx335; Appx3668–3673 ¶¶187–190.) Simply replacing "fuel tank" with "battery" in the Board's preceding paragraphs does not justify invalidating this claim. Those paragraphs dealt solely with the fuel-tank-under-a-seat limitation of claim 17, and there was no dispute that Furuhashi disclosed a fuel tank under a seat. (Appx31.) And although Arctic now points to its expert's testimony to argue that "reasons would prompt one of skill to locate the vehicle battery under the seat opposite the fuel tank" (Red Br. 51–52), the Board never cited or adopted that testimony. (See Appx31–32.)

Similarly, the Board's analysis of claim 19 does not support a finding of invalidity. Neither Denney nor Furuhashi disclose a battery under a seat or a drive shaft extending laterally between the battery and the fuel tank as recited in this

claim.[3] (Appx336; Appx1199 at Fig. 3; Appx1207 at Fig. 2.) Nevertheless, the Board stated that the additional modifications needed to arrive at the novel element recited in claim 19 simply "concern[] placement of certain objects relative to each other, which we are persuaded would have been within the abilities of one of ordinary skill." (Appx 32.) This was error. An invention is not obvious just because it would have been within the abilities of one of ordinary skill. See Personal Web Techs., LLC v. Apple, Inc., No. 2016-1174, 2017 U.S. App. LEXIS 2544, at *13–14 (Fed. Cir. Feb. 14, 2017); see also Belden Inc. v. Berk-Tek LLC, 805 F.3d 1064, 1073 (Fed. Cir. 2015) ("[O]bviousness concerns whether a skilled artisan not only ***could have made*** but ***would have been motivated to make*** the combinations or modifications of prior art to arrive at the claimed invention.") (emphasis in original). Thus, even if accepted as true, the Board's conclusion that claim 19's unique packaging of components "would have been within the abilities of one of ordinary skill" (Appx32) is no more than a conclusion that one of ordinary skill ***could*** have done so, which is insufficient to prove obviousness. See Belden, 805 F.3d at 1073.

---

[3] Arctic's identified expert testimony (Red Br. 52, 56) that supposedly supports such a finding was not credited by the Board in its opinion. (Appx32.)

### c. The Fact that the Components of Claims 17–19 Could Be Located in a Myriad of Different Places on a Vehicle Supports Non-Obviousness, Not Obviousness

As discussed in Polaris's opening brief, the components set forth in claims 17–19 could be positioned and arranged in a myriad of ways other than as set forth in the claims. (Blue Br. 36–39.) Indeed, none of Arctic's art has these components positioned and arranged in a vehicle as recited in the claims, which is why Arctic is relying on obviousness under Section 103.

Instead of disputing this, Arctic states that it provided reasons that could motivate a person of skill in the art to position and arrange components as recited in the claims. But merely providing a potential reason to make a change is not sufficient, as a matter of law, to render an invention obvious. See, e.g., Black & Decker, 646 F. App'x at 1027 (making modification inconsistent with reference's stated goal indicates nonobviousness); Winner Int'l Royalty Corp. v. Wang, 202 F.3d 1340, 1349 (Fed. Cir. 2000) ("Trade-offs often concern what is feasible, not what is, on balance, desirable. Motivation to combine requires the latter."). This Court has found claims valid even in the face of evidence that reasons exist to make a modification—such as when evidence indicates that a POSITA also had good reason to ***not*** make the change. See Winner, 202 F.3d at 1349 ("[T]he district court did not clearly err in finding that one of ordinary skill in the art would not have reasonably elected trading the benefit of security for that of

convenience.”). Here, Arctic does not dispute that Denney teaches away from raising his seats to accommodate the components arranged as recited in claims 17–19, which is better reason for ***not*** making the modifications proposed by Arctic than the reasons Arctic provides, with hindsight, to make the modifications.

Further, the existence of myriad different design possibilities, in and of itself, supports the conclusion of non-obviousness. Arctic points to each change in isolation (e.g., putting a battery under a seat), and argues that there are only a finite number of places to put each component. (Red Br. 54–55.) But that analysis quickly breaks down when one properly considers the invention as a whole instead of each element in isolation. If, for example, eight different components of a vehicle can each be put in eight different possible locations, the total number of possible packaging combinations for those eight components could easily exceed one million! The fact that Arctic’s expert can, with hindsight, give a reason for placing each of those different components in each of those possible locations does not make all million combinations obvious. The existence of numerous possible design configurations leads to the conclusion of nonobviousness, not obviousness.

#### d. Arctic Effectively Concedes that the Board Did Not Provide an Adequate Basis for Invalidating Claims 18–19

In an effort to argue that the Board sufficiently articulated a basis for invalidating claims 17–19, Arctic points to the Board’s reference to paragraph 126

of Dr. Davis's Declaration. (Red Br. 54 (citing Appx31).) But that paragraph deals solely with claim 17's requirement that the fuel tank be under a seat, and not with the additional battery and front drive shaft elements of claims 18–19. (Appx1030–1031.) Arctic also points to Polaris's supposed "concession that the locations for the claimed components were known." (Red Br. 54 (citing Appx31).) But that is not what Polaris conceded, as is readily apparent from reading the citation (and not Arctic's sentence). The "concession" actually was only that "[t]here are many other potential locations for a gas tank in an ATV." (Appx31.) Even Arctic is unable to point to any discussion or articulation by the Board of evidence and reasons to justify the Board's conclusion that claims 18–19 are invalid as obvious.

This Court has emphasized that the Board must explain its findings as to why a POSITA supposedly would have been motivated to make the proposed combinations and modifications. See, e.g., In re Nuvasive, Inc., 842 F.3d 1376, 1381–84 (Fed. Cir. 2016). "The [Board's] own explanation must suffice for [the Court] to see that the agency has done its job . . . ." Id. at 1383. Arctic's attempts to support the Board make clear that the Board did not adequately justify its conclusion that claims 18–19 were invalid as obvious.

## B. Claim 1 Would Not Have Been Obvious

"The real question is whether [a] skilled artisan would have plucked one reference out of the sea of prior art" and combined it with the other reference(s) "to address some need present in the field . . . ." WBIP, LLC v. Kohler Co., 829 F.3d 1317, 1337 (Fed. Cir. 2016). Neither Arctic nor the Board point to any evidence indicating that there was any recognized need for a four-wheel-drive side-by-side all-terrain vehicle that had a different configuration than all the other vehicles already in the market, such that a POSITA would select Denney as a starting point.

The prior art included four-wheel-drive vehicles that could go over different terrains, such as the saddle-style ATVs and the side-by-side seating UVs. Take, for example, Arctic's own Arctic Cat 300 and Prowler, Polaris's own Sportsman® 400 and Ranger, and Yamaha's Rhino. (Blue Br. 3–4.) Neither Arctic nor the Board identify any motivation or need to develop a different four-wheel-drive vehicle, whether saddle style or side-by-side style.

Further, Arctic does not dispute Polaris's assertion that "the evidence shows that a POSITA does not simply convert a rear-wheel-drive vehicle to a four-wheel-drive vehicle without having to do a complete vehicle redesign, which would motivate such a person to *not* modify Denney as Arctic contends." (Blue Br. 49.) If a POSITA believed a four-wheel-drive vehicle was needed then such artisan would have selected an existing four-wheel-drive vehicle as the starting point, and

***not*** Denney. (Appx3627–3628 ¶¶117–118.) The Board improperly swept this evidence to the side, going so far as to state that Polaris's reference to using existing four-wheel-drive side-by-side vehicles such as the Prowler and Ranger as a starting point "insinuat[es] that the proper lead reference is a side-by-side ATV such as Denney." (Appx13 n.9.) The Board inexplicably ignores the fact that such vehicles were four-wheel-drive, while Denney was not, which was Polaris's point.

Arctic tries to take advantage of Polaris's concession that modifying Denney "was within a skilled artisan's technical ability." (Red Br. 37.) As previously discussed, the fact that a POSITA **could** create a particular vehicle design does not mean that a skilled artisan **would have been motivated** to do so, which is what is required for obviousness. Belden, 805 F.3d at 1073.

Other than hindsight, there simply is no evidence that a POSITA, motivated to create a four-wheel-drive side-by-side all-terrain vehicle would select Denney's (or any other) rear-wheel drive vehicle as a lead reference from the vast sea of rear-wheel-drive vehicles, front-wheel-drive vehicles, and four-wheel-drive vehicles.

### C. Arctic's Arguments with Respect to Claim 34 Are Not Persuasive

#### 1. Denney Teaches Away

Arctic accepts its expert's testimony that Denney's engine compartment is directly over, rather than forward of, Denney's rear axle. (See Blue Br. 50; Red Br. 3, 16–17, 57–61.) Thus, it is undisputed that Denney does not disclose claim

34's "rear axle assembly supported by the rear frame portion rearward of the engine." (Appx1195.)

Arctic also accepts that Denney's specific design intent was to have a short wheel base (i.e., a short distance between the front and rear axles) in order to overcome known problems with longer wheel bases, and that a POSITA would know that lengthening a wheelbase had undesirable consequences. (See Blue Br. 5; Appx26; Appx3644–3648 ¶¶ 159, 161–166.) The entire purpose of Denney's swept A-frame suspension was to shorten the wheelbase. Thus, it is undisputed that a POSITA would be motivated to ***not*** lengthen the wheelbase unless the reasons for doing so outweighed the reasons for keeping the wheelbase as is.

Instead, Arctic argues that reasons exist for modifying Denney to meet this limitation (i.e., moving Denney's rear axle rearward to lengthen Denney's wheel base), and that the existence of such reasons necessarily means that claim 34 is obvious. (Red Br. 58–61.) But again, the question is not whether ***a*** reason exists to make a modification. Instead, the question is whether a POSITA actually would, on balance, have been motivated to make the modification to arrive at the claimed invention in view of such reasons both for and against making the change. See, e.g., Cheese Sys. v. Tetra Pak Cheese & Powder Sys., 725 F.3d 1341, 1352 (Fed. Cir. 2013); Winner, 202 F.3d at1349. And the Board did not answer that

question, stating simply that the existence of countervailing reasons gives rise to its "subjective intent" analysis. (Appx26–27.)

Arctic also ignores this Court's precedent: "A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the [patentee]." Depuy Spine, 567 F.3d at 1327 (emphasis added, internal citation omitted). The undisputed evidence here is that a POSITA, upon reading Denney, would be led in a path divergent from the Board's (and Arctic's) alleged obvious modification. A POSITA would be led to maintaining or further shortening Denney's wheelbase, not lengthening the wheelbase.

Arctic relies exclusively on the Urbanski case[4] to justify the Board's result. (Red Br. 59–61.) But Urbanski does not apply here. The question in Urbanski was whether a POSITA "would have been motivated to modify the Gross process in view of Wong to use a shorter reaction time." 809 F.3d at 1242. "Gross teaches a longer reaction time, whereas Wong teaches a shorter reaction time." Id. Urbanski acknowledged that a reference leading a POSITA in a "divergent" direction teaches away and then explained why Gross did not teach away: "Gross does not

[4] In re Urbanski, 809 F.3d 1237 (Fed. Cir. 2016).

criticize or discredit the use of a shorter reaction time. Accordingly, we conclude that the Board did not err . . . ." Id. at 1244.

Denney, unlike the prior art in Urbanski, ***does*** criticize a longer wheelbase. It expressly identifies the longer wheelbase of low center of gravity vehicles such as sand rails and dune buggies as ***the problem*** to be overcome by its invention. (Appx1201 at 1:38–40.) Therefore Denney teaches away, and the Board erred by ignoring this evidence in favor of its "subjective preferences" analysis.

### 2. Polaris's Secondary Considerations Should Not Have Been Disregarded by the Board

Polaris offered unrebutted evidence establishing that certain RZR® vehicles embody claims 34, 36–38 of the '405 patent. (Blue Br. 54–55.) Arctic has never disputed Polaris's expert's sworn testimony.

Dr. Moskwa testified under oath that he inspected the RZR® vehicles and reviewed relevant literature to analyze whether they were commercial embodiments of the '405 patent. That is a reliable methodology given the technology at issue, and it enabled Dr. Moskwa to gain "sufficient facts or data" to reach his conclusion. Fed. R. Evid. 702(b); see, e.g., Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc., 87 F. Supp. 3d 928, 940 (N.D. Cal. 2015) ("In this circumstance, the Court finds 'it to be a matter of common sense' that a visual and manual inspection would be one acceptable way for a mechanical engineer to assess the structural characteristics of a bicycle seat.") (internal citation

omitted). Arctic neither rebutted Dr. Moskwa's opinion nor challenged his methodology under Rule 702. Like in Icon-IP, Dr. Moskwa's analysis was a matter of common sense. Artic had a full opportunity to cross examine Dr. Moskwa and offer any rebuttal evidence, but it did neither.

There is no evidence suggesting that Arctic and Arctic's expert were unable to evaluate whether Polaris's RZR® vehicles embody the claims of the '405 patent. Polaris's vehicles are commercially available and their parts manuals are available online. Arctic, being a fierce head-to-head competitor of Polaris, cannot argue that it is unfamiliar with Polaris's RZR® vehicles.[5] Furthermore, Polaris provided extensive documentation to Arctic regarding its vehicles, such as the following:






[5] Indeed, in a different *inter partes* review proceeding involving an unrelated Polaris patent (U.S. Patent No. 9,217,501 (the "'501 patent")), Arctic has identified and is relying on the same RZR® vehicle at issue here as a commercial embodiment of the patent application that issued as the '405 patent. Arctic Cat v. Polaris Industries Inc., IPR2017-00433, Paper 2 at 30, 71, 93, 108 (P.T.A.B. Dec. 8, 2016).







(Appx353; Appx3468; Appx3471; Appx3515; see also Appx3423–3434, Appx3435–3438, Appx34703475, Appx3480, Appx3514–3521, Appx3535–3550, Appx3551–3566.) Had Arctic needed more information, it could have sought additional discovery from Polaris. See Garmin Int'l, Inc. v. Cuozzo Speed Techs. LLC, IPR2012-00001, 2013 Pat. App. LEXIS 6301, at *7–8 (P.T.A.B. Mar. 5, 2013). But Arctic did not—because it knew the arrangement of the RZR® and that it was covered by claims of the patent. Arctic never identified a single basis to challenge the veracity of Dr. Moskwa's opinion.

Because Dr. Moskwa's testimony is unassailable, Arctic instead mounts only a technical challenge to the testimony, claiming that Polaris has not met its burden because Dr. Moskwa did not offer ***sufficient*** details to substantiate his opinion. (Red Br. 64.) The Board improperly accepted this argument.

Polaris's unrebutted evidence should not have been rejected. PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC, 815 F.3d 734, 747 (Fed. Cir. 2016) ("[I]t is error for the Board to find to the contrary [of unrebutted

evidence] without further explanation.”). As in PPC Broadband, the Board here further erred by not providing a reasoned explanation to disregard Polaris’s evidence. See id. (finding that “[t]he Board in its opinions did not explain why the SignalTight connectors [commercial embodiments] fail to embody the claimed features or what claimed features in particularly are missing.”). Rather, the Board stated—incorrectly—that “the entirety of Patent Owner’s analysis” was captured by a footnote. (Appx33; see also Red Br. 62.) Although the Board then referenced the underlying expert testimony supporting Polaris’s analysis, the Board concluded that the “statements [were] devoid of any analysis as to how the RZR® vehicles are covered by the [sic] claims 34 and 36–38 of the ’405 patent.” (Appx34.) But Polaris’s expert performed the analysis required by Markman (Blue Br. 63), and Polaris’s expert performed the appropriate analysis given the “common sense” analysis which was required.

On appeal, Arctic argues that a “limitation-by-limitation analysis” or “documentary evidence” was required. (See Red Br. 65.) But Arctic did not cite any case that requires that sort of form over substance analysis, and neither did the Board. PPC Broadband indicates the opposite – that a “limitation-by-limitation analysis” is not required. 815 F.3d at 746–47. Polaris’s expert used an unchallenged methodology and gave definitive and unrebutted conclusions, and there is no basis to reject it.

When a point is not credibly in dispute, common sense and efficiency allow for a lesser volume of evidence to suffice. That is particularly so in this instance where Polaris had to defend the validity of its ’405 patent in the face of procedural limits—only 60 pages for its Patent Owner’s Response—pursuant to the version of 37 C.F.R. § 42.24 in effect at the time. A claim chart showing how each RZR® embodiment satisfies each of the 20-plus elements of claims 34 and 36–38 of the ’405 patent, as Arctic suggest was required, would have taken up most or all of Polaris’s allotted pages. And pursuant to 37 C.F.R. § 42.6(a)(3), Polaris could not incorporate the claim charts by reference via Dr. Moskwa’s declaration.

Arctic’s cases do not support its argument that a claim chart is required, nor do they justify the Board dismissing Polaris’s evidence without a reasoned explanation. Arctic first cites to J.T. Easton & Co. But there, the Federal Circuit determined that the analysis of one expert “suggest[s] that certain of [patentee’s] products ***may*** embody the claimed invention, and for that reason, [the Court] conclude[d] that the issue of nexus should be reexamined on remand.” J.T. Easton & Co. v. Atl. Paste & Glue Co., 106 F.3d 1563, 1571 (Fed. Cir. 1997) (emphasis added). In contrast, Polaris’s expert here testified definitively and unequivocally that certain RZR® vehicles embody claims of the ’405 patent; that evidence is unrebutted and should have been considered by the Board.

Arctic next cites to ClassCo, Inc., but that case supports Polaris. The Court ruled that, because the patentee "***presented unrebutted evidence*** that its products experienced some, albeit limited, commercial success, ***and that those products embodied the claimed features,***" the evidence should be considered. ClassCo, Inc. v. Apple, Inc., 838 F.3d 1214, 1222 (Fed. Cir. 2016) (emphasis added). "[T]he Board's blanket dismissal of it was in error." Id. The same is true here.

Finally, Arctic attempts to distinguish PPC Broadband on the basis that, "unlike here, the patentee PPC had actually presented evidence . . . ." (Red Br. 65.) That argument disregards the facts of both this case and PPC Broadband. First, Polaris presented evidence to the Board, i.e., undisputed expert testimony based on an unchallenged methodology. Second, the patent owner in PPC Broadband did not submit declarations showing "all elements" of the disputed claims. To the contrary, the Board had expressly found that the patent owner was merely "**infer[ring]**" that a product satisfied a claim element. Corning Optical Commc'ns, v. PPC Broadband, Inc., 2014 Pat. App. LEXIS 7762, *58 (P.T.A.B. Nov. 21, 2014) (emphasis added). This Court did not reject that finding but nonetheless held that the Board erred by refusing to accept the patent owner's evidence. PPC Broadband, Inc., 815 F.3d at 746–47. The Federal Circuit found it important that the petitioner "did not argue to the Board that the [alleged commercial embodiments were] not commercial embodiments. Id.

Applying the same principles here requires consideration of Polaris's secondary considerations evidence.

### 3. Polaris Is Entitled to a Presumption of Nexus between Its Sales and the '405 Patent

Polaris is legally entitled to a presumption of nexus. (See Blue Br. 60, citing Kohler, 829 F.3d at 1329 (holding presumption applies for a claimed "marine engine" because "there is a presumption of nexus . . . when the patentee shows that the asserted objective evidence is tied to a specific product and that product is the invention disclosed and claimed in the patent" as opposed to only a component of product).) Indeed, in a related IPR proceeding involving Polaris and Arctic, the Board relied on Kohler to rule that Polaris "has established a presumption of nexus between the proffered objective evidence of secondary considerations and the challenged claims." Arctic Cat Inc. v. Polaris Indus. Inc., IPR2015-01781, Paper 47 at 37 (P.T.A.B. Jan. 30, 2017).

Arctic seeks to avoid this conclusion by arguing that Polaris's claims do not cover all aspects of the claimed "All-terrain vehicle." Arctic argues, for example, that Polaris's claims are not commensurate in scope because—even though they claim "an engine"—they do not recite "an electronically fuel-injected engine." (See Red Br. 70.) This argument misunderstands the law. See Kohler, 829 F.3d at 1329; see also PPC Broadband, Inc., 815 F.3d at 747 (noting that presumption may

still apply "even when the product has additional, unclaimed features") (citing cases).

Even Demaco—a case cited by Arctic—demonstrates Arctic's error. That case involved a patent claiming "[g]round covering slab elements for paving ground areas" having various requirements. Demaco Corp. v. F. Von Langsdorff Licensing, Ltd., 851 F.2d 1387, 1389 (Fed. Cir. 1988). The claims in Demaco did not recite each potential aspect of the commercial embodiment, e.g., the chemical composition, size, density, and weight were not recited. See id. This Court nonetheless concluded that the patent owner was deserving of a presumption of commercial success because the commercial embodiment was still commensurate in scope. Id. at 1394. The claims need only be reasonably commensurate in scope, not absolutely commensurate. Rambus Inc. v. Rea, 731 F.3d 1248, 1257 (Fed. Cir. 2013).

If adopted, Arctic's approach would create a near-impossible burden. Only claims that recite exactly the commercial embodiment would be eligible for a presumption. That approach has been rejected. It is too great of a burden to require a patent owner to negative all other potential causes of success. Demaco Corp., 851 F.2d at 1394 ("A requirement for proof of the negative of all imaginable contributing factors would be unfairly burdensome, and contrary to the ordinary rules of evidence.")

The Federal Circuit has rejected other efforts to unfairly limit evidence of commercial success. In ClassCo, Inc., the Court reversed the Board's finding that the evidence was not commensurate in scope with the claims because the law does not "require a patentee to produce objective evidence of nonobviousness for every potential embodiment of the claim." 838 F.3d at 1221 (internal citation omitted); see also Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc., 98 F.3d 1563, 1570 (Fed. Cir. 1996) ("[A] patentee need not show that all possible embodiments within the claims were successfully commercialized in order to rely on the success in the marketplace of the embodiment that was commercialized.")

Arctic argues that, "[t]he record is full of Polaris's own statements demonstrating that the rear engine placement of claim 34 was merely one aspect—a component—of the overall RZR design." (Red Br. 69.) Claim 34 of the '405 patent claims the overall design of Polaris's RZR® models, not just the rear engine placement, and it is that overall design that drove success and is the relevant legal inquiry. (Blue Br. 58–60); see Kohler, 829 F.3d at 1330 ("Where the allegedly obvious patent claim is a combination of prior art elements, we have explained that the patent owner can show that it is the claimed combination as a whole that serves as a nexus for the objective evidence . . . .").

Arctic's reliance on In re Mettke is also off point. In that case, the claim itself covered a "public on-line Internet terminal" having various components. In

re Mettke, 570 F.3d 1356, 1358 (Fed. Cir. 2009). This case is nonprecedential and the Federal Circuit did not explain in detail its rationale for finding a lack of nexus; however, the claim at issue did not include the Internet. See id. at 1358, 1361. Common sense suggests that, without the Internet, a public online Internet terminal would likely have little value, so the Court's decision to deny the presumption makes sense. Polaris's '405 patent claims are different, covering the entirety of the commercial RZR® embodiment. This is more akin to the claim at issue in Kohler Co., where the claim covered "A marine engine comprising . . ." and this Court held that the patentee was entitled to the presumption of nexus. 829 F.3d at 1308.

**4. Arctic Did Not Rebut Polaris's Secondary Considerations**

Once Polaris is granted its presumption, it was "the task of [Arctic Cat] to adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention, such as advertising, superior workmanship, etc." Demaco Corp., 851 F.2d at 1394. It has long been known that "[a]rgument and conjecture are insufficient." Id. (quoting Rosemount, Inc. v. Beckman Instruments, Inc., 727 F.2d 1540, 1546 (Fed. Cir. 1984)).

Arctic first argues that "Polaris's own data showed RZR sales spiking after the introduction of features plainly not covered by the patent." (Red Br. 75.) The fact that Polaris's next-generation RZR® vehicles also enjoyed commercial success offers no insight—beyond conjecture—into what drove the sales of

Polaris's RZR® commercial embodiments. See, e.g., PPC Broadband, 815 F.3d at 747 n.3 ("[I]t would be wrong to conclude that a product with a high market share is not commercially successful solely because it is replacing a similarly successful earlier version of the product produced by the same company").

Arctic next argues that "[a]ny of the RZR components discussed above—the electronically fuel-injected engine, the 'double A-arm suspension,' the 'front anti-sway bar,' etc.—***could have*** driven demand." (Red Br. 75 (emphasis added).) Arctic's use of "could have" shows that it is merely offering conjecture.

Arctic's rebuttal arguments are legally insufficient. See Demaco Corp., 851 F.2d at 1393–94.

**5. Polaris's Secondary Considerations Are Particularly Strong and Overcome Any Purported Prima Facie Case of Obviousness**

Polaris's covered RZR® vehicles have generated over $1.5 billion in sales, resulted in tens of thousands of vehicles sold, and allowed Polaris to become a market leader. (Blue Br. 57–58.) That is "particularly strong" evidence of non-obviousness. See Intri-Plex Techs., Inc. v. Saint Gobain Performance Plastics Rencol Ltd., IPR2014-00309, Paper 83 at 46 (P.T.A.B. March 23, 2014). Arctic has provided no counter evidence, having been unable to (1) dispute that Polaris's RZR® vehicles are embodiments of the '405 patent or (2) establish an extraneous factor, other than the patented invention, to explain Polaris's commercial success.

This weighs heavily against a finding of obviousness and justifies the Federal Circuit holding claims 34 and 36–38 are not invalid.

Arctic argues for a different conclusion based on In re Ethicon, Inc., 844 F.3d 1344 (Fed. Cir. 2017). (Red Br. 76–77.) Arctic states that, "as in Ethicon, Polaris failed to establish that any commercial success was due to the claimed features, as opposed to some 'unclaimed feature' of the RZR products." (Red Br. 77.) But as stated above, it was Arctic's burden to establish that Polaris's massive commercial success was due to "extraneous factors other than the patented invention," and Arctic knew that "[a]rgument and conjecture are insufficient." (See supra, Section I(C)(4).) Arctic's expert shows that it failed to meet its burden, testifying "I don't have an opinion as to which specific feature drove sales anymore [sic] than one other feature." (Appx4799 at 142:21–25.)

## II. The Board Correctly Found that Arctic Failed to Prove Unpatentability Based on Hickey and Hill in the 1428 IPR

### A. Properly Construed, "Extending Between" Requires that the Drive Shafts Span the Distance Between the Transmission and the Axle Assemblies

Claim 1 of the '405 patent is the only independent claim at issue in the 1428 IPR. It requires front and rear drive shafts "extending between" the transmission and the front and rear axle assemblies, respectively. The phrase "extending between" requires that the drive shaft span the distance from the transmission to the front/rear drive assembly. Consequently, claim 1 does not read on Hickey

because the front drive shaft in Hickey extends from the interaxle differential to the front axle assembly and the rear drive shaft extends from the interaxle differential to the rear axle assembly; the drive shafts do not extend from the transmission to the axle assemblies.

This construction is fully supported by the intrinsic and extrinsic evidence. The ordinary meaning of "extend" when describing a physical structure is "to stretch out to fullest length"; "to cause to reach (as in distance or scope)"; or "to stretch out in distance, space, or time". (Appx9400–9401.) Thus, the ordinary meaning of "extending between" means that the drive shaft must continue over a specified distance—that is, the distance from the transmission to the front/rear axle assembly. One would describe a femur bone as "extending between" the hip and the knee because it spans the full length between those structures. But one would not say that the femur bone "extends between" the hip and the foot simply because it is located between the hip and the foot. A train line that runs from Miami to Washington, D.C. would be described as "extending between" Miami and Washington, D.C. but would not be described as "extending between" Miami and Boston simply because it will get you part way there.

The '405 patent specification uses "extending between" in a manner fully consistent with this ordinary meaning. The term appears four other times, each

time describing a component that physically spans the entire distance from one location to a second location:

- "wheelbase A, which **extends between** the center of front axle 36 and the center of rear axle 38, is equal to about 77 inches (195.6 centimeters)." (Appx1190 at 4:13–15 (emphasis added).)
- "In the illustrative embodiment, width C, which is defined as the overall width of ATV 10, **extends between** the outermost lateral points of ATV 10." (Id. at 4:30–33 (emphasis added).)
- "Upper ends of dampeners 217 are pivotally coupled to bracket 223 **extending between** rear tubes 207." (Appx1192 at 8:51–53 (emphasis added).)
- "Front brackets 162 and rear brackets 160 **extend between** lower tubes 180 and down tubes 105." (Id. at 8:2–4 (emphasis added).)

Such usage in the specification is strong evidence of the proper claim construction. E.g., Microsoft, 789 F.3d at 1298 ("Even under the broadest reasonable interpretation, the Board's construction cannot be divorced from the specification and the record evidence") (internal citations omitted). Arctic has pointed to no instance where the '405 specification uses "extending between" to refer to a structure that is merely located between two other structures.

Arctic's argument that "extending between" merely requires that the drive shaft be located somewhere between the transmission and the axle assemblies, but need not span the distance between them, suffers from multiple problems. One, claim 1 also requires that the front/rear drive shafts perform the function of "coupling the transmission" to the front/rear wheels. The parties agreed that "coupling" refers to both direct and indirect connections, i.e., they allow other elements to be disposed in the chain of connection. (Appx46.) Thus, if "extending between" was interpreted as merely requiring that the drive shaft be positioned somewhere in the chain of connection between the transmission and the axle assemblies, then "extending between" would not add anything to claim 1 that was not already required by the "coupling" language. A construction that renders claim language superfluous is presumed to be improper. Mformation Techs., Inc. v. Research in Motion Ltd., 764 F.3d 1392, 1399 (Fed. Cir. 2014) (declining to adopt construction because it would render another limitation in the same claim superfluous).

Two, Arctic's construction is contrary to the doctrine of claim differentiation. This doctrine is based on "the common sense notion that different words or phrases" used in different claims are presumed to carry "different meanings and scope." Karlin Tech., Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 971–72 (Fed. Cir. 1999). Here, claim 1 uses the term "extending between," while

claims 4 and 15 use the term "positioned between." (Appx1194 at claim 4 ("a transmission shift lever extending through a console positioned between the seat bottoms"); id. at claim 15 ("a protective panel positioned between the pair of laterally spaced-apart seating surfaces and the engine").) Under the doctrine of claim differentiation, the term "extending between" should not be construed the same as the claim term "positioned between."

The Board correctly rejected Arctic's proposed construction of "extending between." Properly construed, the term requires that the drive shafts span the distance between the transmission and the axle assemblies.

### B. Arctic's Primary Attack on the Construction of "Extending Between" is Premised on a New Argument that Is Contrary to Arctic's Position in the 1427 IPR and Is Wrong

Arctic's primary attack on the Board's construction of "extending between" is that it would exclude the preferred embodiment of the '405 patent—a construction that is "rarely, if ever, correct." (Red Br. 82–85 (quoting Clare v. Chrysler Grp. LLC, 819 F.3d 1323, 1331 (Fed. Cir. 2016).) Polaris agrees that the claims should not be interpreted to exclude the preferred embodiment. However, the proper construction of "extending between" does not exclude the preferred embodiment, and Arctic's argument to the contrary is wrong for at least two reasons.

First, “extending between” does not require that the drive shaft physically touch the transmission and axle assemblies at each end. As a matter of common sense, the drive shaft must be coupled to the transmission and the axle assembly by some means. The ’405 specification teaches U-joints and couplers for this coupling purpose. (Appx1192 at 7:46–57.) Even assuming that the claim term “drive shaft” is limited to the rigid shaft itself (as Arctic assumes in its appeal brief without proving), the mere presence of connecting structure at either end does not preclude the drive shaft from “extending between” the transmission and the axle assembly, i.e., spanning the distance between those two components. In this regard, there is a fundamental difference between intervening equipment such as an interaxle differential (as in Hickey) and mere drive shaft connectors (as in the preferred embodiment of the ’405 patent).[6]

Second, Arctic’s unproven premise that the claim term “drive shaft” necessarily excludes associated couplers and U-joints is a new claim construction on appeal that is contrary to Arctic’s position in the 1427 IPR and is wrong. In the vehicle art, the rigid tubular shaft itself is often referred to as a “drive shaft,” but

---

[6] In its Final Written Decision, the Board characterized Polaris’s proposed construction of extending between as requiring that the drive shaft “account for the entire distance between the transmission and the respective axle assembly.” (Appx54–55.) It is not clear what the Board meant by the word “entire.” Polaris never used that word in it proposed construction. To the extent that word was intended by the Board to import a requirement for physical touching at either end, it both misstates Polaris’ position and is wrong.

the combination of that shaft and its couplers and U-joints is **also** referred to as a "drive shaft." Before the Board, Polaris presented unrebutted evidence and undisputed argument that the claim term "drive shaft" can (and typically does) include the associated connectors and U-joints that connect and provide flexibility to the drive shaft. Dr. Moskwa testified specifically on this point. (Appx8361 ¶ 56.) He supported his testimony with an example from the art showing a "two-piece drive shaft" employing multiple shafts and connectors:




Figure 6-3 A two-piece drive shaft is often used when there is a great distance between the transmission and the rear axle. (Courtesy of Chrysler Corporation)

(Id.; see also Appx4639 ("The drive shaft is normally made from seamless steel tubing with universal joint yokes welded to both ends of the shaft.").) Arctic's expert submitted and relied on exhibits saying the same thing. (Appx7831 ("These shafts are either one- or two-piece assemblies consisting of a shaft with U-joints attached to each end."); see also Appx7823–7843.)

The fact that the '405 specification, in describing Fig. 19 of the preferred embodiment, identifies front drive shaft 146 as well as the universal joint 144 and a coupler 142 does not mandate a narrow construction of the claim term "drive shaft" that excludes associated couplers and U–joints. Claims are not limited to

the preferred embodiment, and there is nothing definitional in the language used to describe the preferred embodiment of Figure 19. This Court has previously rejected similar attempts to narrow claim terms based on similar language in the specification. See, e.g., GE Lighting Sols, LLC v. AgiLight, Inc., 750 F.3d 1304, 1308–10 (Fed. Cir. 2014) (where the term "IDC connector" was "commonly used in electrical engineering to connote a range of devices . . . [i]t was error to import the structural limitations of the preferred embodiment and the structural limitations of the dependent claims into the term IDC connector."); see also In re Gorelik, 652 F. App'x 954, 958 (Fed. Cir. 2016) (finding that while the specification describes only "a hollow cylindrical analyzer with flat lids," the "we do not agree that the broadest reasonable interpretation of the claims is so limited"). Particularly under the BRI standard applicable in IPR, this non-definitional language is not sufficient to depart from the plain and ordinary meaning of "drive shaft" to those skilled in the art.

The prosecution history contains much more relevant intrinsic evidence in this case. The claims as originally filed in the parent case to which the '405 patent claims priority as a continuation included the following dependent claim:

> 12. The all-terrain vehicle of claim 1, further comprising a driveshaft adapted to power at least one of the pair of front wheels, the transmission including a splined output shaft, ***and the driveshaft including a coupler adapted to operably couple with the splined output shaft***.

(Appx3300.) This is clear and unequivocal evidence that the claim term "drive shaft" in the '405 patent can have the broader meaning in the art that includes associated couplers that attach the drive shaft at either end. See Phillips v. AWH Corp., 415 F.3d 1303, 1317 (Fed. Cir. 2005) ("[T]he prosecution history provides evidence of how the PTO and the inventor understood the patent.").

Having failed before the Board to dispute Polaris's construction of "drive shaft" or to offer a competing construction of its own, Arctic cannot now offer a different construction for the first time on appeal. VirnetX Inc. v. Apple Inc., 2016 U.S. App. LEXIS 21887, at *6 (Fed. Cir. Dec. 9, 2016) ("The waiver doctrine preclude[s] a party from adopting a new claim construction position on appeal." (internal citation omitted).). This is particularly so because Arctic did not merely fail to dispute Polaris's construction of drive shaft in the 1428 IPR, it **expressly relied on that construction** in the 1427 IPR. In fact, both Arctic and its expert Davis did so. Recall that in the 1427 IPR, Arctic relied on Furuhashi to show the four-wheel drive components that are missing in Denney. Here is the color-coded figure created by Davis and relied on by Arctic to show how the '405 claims should be read on Furuhashi:




(Appx989 ¶63.) Highlighted in blue and labeled "Front propeller shaft 18" is a complex structure made up of two rigid shafts, a U-joint between them, and connectors at either end. Thus, when arguing that Furuhashi showed Polaris's claimed drive shaft, Arctic interpreted drive shaft to include multiple shafts along with u-joints and connectors.

The claims read on Figure 19 because the claimed "front drive shaft" includes both the U-joint 144 and the coupler 142 that directly attach the drive shaft to the transmission. This front drive shaft spans the distance between the transmission and the front axle assembly and, therefore, "extends between" those components as that term was correctly construed by the Board.

### C. Because Hickey Undisputedly Does Not Meet the Properly-Construed "Extending Between" Limitation, This Court Should Affirm the Board's Decision in the 1428 IPR

Under the proper construction of "extending between," the drive shafts of Hickey undisputedly do not extend between the transmission and the axle

assemblies, as required by claim 1 of the ’405 patent. Hickey’s front and rear drive shafts extend between the interaxle differential and the front and rear axle assemblies, respectively:




(Appx6095.) It does not have drive shafts that extend between the transmission and the axle assemblies.

Arctic does not make an alternative argument that, if it is wrong on the construction of “extending between,” Hickey somehow nonetheless meets this limitation. Nor does Arctic make any obviousness argument relative to the drive shaft of Hickey (nor did it do so before the Board). Therefore, this Court should affirm the Board’s conclusion that Arctic failed to prove invalidity of the ’405 claims in the 1428 IPR.

## <u>CONCLUSION AND STATEMENT OF RELIEF SOUGHT</u>

For the foregoing reasons, the Board's decision invalidating the claims of the '405 patent in the 1427 IPR should be reversed, and the Board's decision upholding the patentability of the claims in the 1428 IPR should be affirmed.

Respectfully Submitted,

Dated: March 17, 2017

/s/ J. Derek Vandenburgh
J. Derek Vandenburgh
Alan G. Carlson
Dennis C. Bremer
CARLSON CASPERS VANDENBURGH LINDQUIST & SCHUMAN, P.A
225 South Sixth Street, Suite 4200
Minneapolis, Minnesota 55402
Phone: (612) 436-9600
Fax: (612) 436-9605
dvandenburgh@carlsoncaspers.com

*Attorneys for Appellant*
Polaris Industries Inc.

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and this Court's Order consolidating appeals (Dkt. No. 18). This brief contains 11,568 words, calculated by the word processing system used in its preparation.

Dated: March 17, 2017

*/s/ J. Derek Vandenburgh*
J. Derek Vandenburgh

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing **APPELLANT POLARIS INDUSTRIES INC.'S REPLY BRIEF AND RESPONSE TO CROSS-APPEAL** was served electronically via CM/ECF and e-mail on March 17, 2017 in its entirety on the following:

John C. Adkisson
Robert P. Courtney
Joseph A. Herriges
Conrad Gosen
Fish & Richardson
3200 RBC Plaza, 60 South Sixth Street
Minneapolis, MN 55402
Tel: 612-337-2569 / Fax 612-288-9696
adkisson@fr.com
gosen@fr.com

/s/ J. Derek Vandenburgh
J. Derek Vandenburgh
Carlson, Caspers, Vandenburgh, Lindquist & Schuman, P.A.
225 South Sixth Street, Suite 4200
Minneapolis, MN 55402
Telephone: (612) 436-9600
Facsimile: (612) 436-9650

Attorney for Polaris Industries Inc.